# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00731-CR

**Raymond Langston Book, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT NO. D-1-DC-10-206377, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Raymond Langston Book guilty of murder. The trial court, after finding he committed two previous felonies, assessed sentence at forty years in prison. On appeal, appellant contends that the trial court erred (1) by denying his motion to suppress evidence gleaned from the search of a knife that an officer obtained from appellant, and (2) by refusing to instruct the jury on self-defense or self-defense with deadly force. We will affirm the judgment.

### Background

It is not disputed on appeal that on October 31, 2010, at around 10 p.m., appellant stabbed Edward Dutcher and left him in the median at the intersection of South Pleasant Valley Road and East Riverside Drive. Several people saw the altercation from various vantage points. Police were summoned, and they apprehended appellant. We will focus on testimony and evidence relevant to the issues raised on appeal.

Samantha Ramirez testified that she and her cousins were walking through the intersection when they heard a scruffy white man yelling, "I'm going to kill you." She said the man rushed across the street and "attacked the other guy [who was standing at the intersection] . . . . Didn't pause or anything. Just hit him." She testified that the attacker hit the victim in the back of the head and that, although the victim tried to defend himself with his hands up, she never saw him hit back, or yell at the attacker. Ramirez told police in her statement, however, that she had seen the two guys "fight a little bit by pushing and hitting." She testified that the attacker hit the victim in the abdomen.

Patrick Soto testified that he was near the intersection in his vehicle with his family. He heard two men yelling and arguing in the median, but he could not make out their words. Soto stated, "I didn't see them fighting at that time. I seen them arguing." He described Dutcher as taller but "defenseless" and the assailant as "up in his face, like trying to get him to back up." Soto identified appellant from a computer lineup and in court as the assailant. He said he never saw Dutcher do anything to appellant. Soto said that "after they argued a little, he tried to back up and he was trying to get away from the defendant. He didn't want nothing to do with what was going on." As Dutcher backed away, appellant "was coming at him." Then, appellant swung at Dutcher's abdomen. When asked if "prior to seeing the defendant kind of go towards the victim's abdomen, had you seen anybody else throw any punches, any fights, anything like that?" Soto answered that he never saw any punches thrown. He did not see the knife until appellant was leaving the scene. Soto testified that he saw blood dripping off the knife and saw appellant try to sling the blood off. Soto saw appellant pick up his backpack and go to a nearby gas station. Soto got out of his vehicle and checked on Dutcher, who was not doing well. Believing that the police had the situation in

2

hand, Soto testified that he left the scene, in part because he had a bag of marijuana on him. He later called police and gave a statement.

The Bell sisters, Iecia and Tyra, were at a gas station at the intersection when they heard yelling that drew their attention. Iecia said that, although she wrote in her statement to police that she saw "two bums fighting," she clarified at trial that she meant "arguing, yelling." She did not see either throwing punches, but saw the tall, bald man trying to get away and the shorter man with some facial hair going toward him. The shorter man hit the taller man in the side "like he was stabbing him" a few times. She saw the shorter man throw a dark backpack toward Dutcher, then pick up a bright orange backpack and walk toward another gas station to the water spigot where he washed his hands and what appeared to be a folding knife. She went to check on Dutcher and found him gasping and bleeding. An ambulance arrived shortly thereafter. She did not see any weapons on or near Dutcher. She did not recognize appellant in the courtroom or make a positive identification in a lineup. Tyra testified that she saw a man screaming, trying to run away from another man that was hitting him. Although both men were yelling and she described the altercation as a "fight," she never saw the victim hit the other man. The altercation was verbal except for the man who was punching the other man, then stabbed him. She said that the man who was stabbed had tried to push the other man away. She saw no weapons around the victim when they went to check his condition.

When Austin Police Officer Robert Krummel responded to the report of "two transients fighting," he did not see any active fighting. He found Dutcher lying on the ground bleeding from his left arm. Onlookers told him that the attacker had gone to a nearby gas station and was washing off the knife used to stab Dutcher. He relayed that information to other officers and

3

went looking. Upon learning that another officer had apprehended appellant, Krummel returned to find Dutcher in distress, lifted Dutcher's shirt, and discovered stab wounds in his abdomen and ribs. Despite lifesaving efforts by Krummel and an ambulance crew, Dutcher died.

APD Officer Michael Decker testified that he knew both appellant and Decker from his patrol, and he identified appellant in court by name. He had heard the call about transients fighting, then was told that one of them had left the scene—a white male with long hair and an orange backpack. He saw a man fitting that description and yelled at him to stop, which he eventually did. Decker handcuffed appellant and took him to his patrol car. Decker noticed a closed pocketknife clipped to appellant's pants and protruding from his right back pocket. Decker testified that he removed the knife for his own safety. Decker retrieved the pocketknife and set it on his car. Decker asked for and received appellant's consent to search. After searching appellant, Decker turned his attention to the knife. He told the court that he believed that appellant gave him consent to search the knife as well as his person. Decker told the trial court that he had been told that the victim had a stab wound and that the assailant had washed the knife off, although he did not include the latter in his report. He could not see whether the knife was wet when it was closed. Decker told the court that he opened the knife to see if it still had water on it. Decker stated that this occurred within three to five minutes of the report of the stabbing, and within one hundred fifty yards of the intersection. He testified, "After he gave the consent to search, I put on rubber gloves, opened the pocketknife. I saw that there were fresh beads of water on it, so I took several photographs of the knife." He then arrested appellant.

Decker testified that Dutcher was over six feet tall, while appellant is five feet and nine or ten inches tall, and that Dutcher weighed quite a bit more. Decker said that the intersection

4

was a lucrative one for panhandlers like appellant and Dutcher, that the two men had previously had disagreements over sharing the intersection, and that the two men did not like each other.

APD Crime Scene Specialist Vance Sayers tested the knife on December 16, 2010. He checked the knife for fingerprints, but was unable to find any, and swabbed the knife for DNA. He said he noticed reddish-brown stains on the knife. APD DNA lab supervisor Cassie Carradine testified that the DNA from the handle of the knife showed that appellant contributed the majority of the DNA found there, and Dutcher was excluded. The DNA swab from the knife blade, however, was consistent with Dutcher's DNA profile, though Carradine could not say whether the DNA on the blade was from Dutcher's blood or saliva. She agreed on redirect that, of bodily fluids that typically contain DNA—blood, semen, saliva, or sweat—blood was the most likely to be reddish-brown. But she also agreed that many other things are reddish-brown, including rust and dirt, and that there was no way to tell from a swab whether the DNA profile came from a reddish-brown stained part of the knife blade or a non-discolored part of the blade.

APD Sergeant Raymond Guajardo testified that, about two hours after the altercation, appellant had a linear red mark on his chest. Guajardo described it as not a deep scrape, just a red mark like somebody rubbed that area. It could have come from being hit, leaning against a bar, or a variety of sources.

## Discussion

Appellant challenges the trial court's denial of his motion to suppress evidence and its refusal to instruct the jury on self-defense.

**Motion to suppress**

Appellant contends that the trial court should have suppressed evidence obtained from the search of the knife—which he defines on appeal as the opening of the knife by the officer who detained him on the night of Dutcher's death. In overruling the motion to suppress, the trial court opined in open court that, "under all the circumstances, it was reasonable for what the officer did."

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court's ruling on a motion to suppress will be affirmed if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009). At the suppression hearing, the trial judge is the sole trier of fact and exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). Unless the trial court abuses its discretion by making a finding unsupported by the record, we defer to the court's findings of fact and will not disturb them on appeal. *Miller v. State*, 335 S.W.3d 847, 854 (Tex. App.—Austin 2011, no pet.)

Appellant does not challenge the police officer's stop of him based on the description given by witnesses, the removal of the knife from his pants based on officer safety, or the patdown search following his giving the officer permission to search him. He contends only that the knife was outside the scope of the consent to search that he gave, citing *United States v. Richard*, 994 F.2d 244, 250 (5th Cir. 1993) (consensual search is an exception to warrant requirement) and *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (scope of consent limits scope of warrantless search), among

6

other cases. He argues that he consented to a search of his person and that, because the knife had been removed and placed on top of the police car, it was not on his person and therefore not within the scope of his consent. He contends that opening the knife was a search of the knife for which the police needed a warrant.

The opening of the knife without a warrant was justified by the exigent need to avert the imminent destruction of evidence. Imminence is a critical, sometimes dispositive, aspect of an exigent circumstances inquiry. "Where there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation." *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973). Officer Decker stopped appellant based on a description of a man involved in a fight. He searched the suspect for his own safety and found a knife. He learned that the suspect was believed to have stabbed the victim and that the suspect was believed to have just previously washed the knife used in the stabbing. In the midst of the discussion about the admissibility of the evidence and the permissibility of Decker's actions, the State and Decker had the following exchange:

Q. (BY MS. POWERS) Did you open the knife to see if it had water on it?

A. Yes, ma'am.

Q. And is that why you opened it?

A. Yes, ma'am.

In a case where identity is uncertain, evidence tying a suspect to the crime is critical. In this case, the suspect had been seen washing the knife used in the stabbing only minutes before Decker stopped appellant. In these circumstances, it was reasonable to posit (1) that a knife that had been

7

recently washed might have water on it, (2) that water on a knife retrieved from a person walking away from the scene of the stabbing and subsequent washing might connect the person to the stabbing—particularly when he matches the description of the stabber given by eyewitnesses, and (3) that water on a washed knife might soon evaporate or be wiped off—particularly by an assailant who thought to wash the blade immediately after the stabbing. This combination of factors showed a high risk of the imminent loss or destruction of evidence tying the knife and, conceivably, its possessor, to the stabbing if Decker did not open the knife immediately.

Without regard to whether opening the knife might be permitted under other theories, we conclude that the exigent circumstance of the imminent possible destruction of evidence made Decker's opening of the knife reasonable and permissible. The water on the blade, combined with the other circumstances, made the arrest and the seizure and opening of the knife reasonable. That, in turn, made the subsequent DNA testing of the knife reasonable.

The trial court did not abuse its discretion by denying the motion to suppress the knife and evidence obtained through testing it.

**Self-defense instruction**

Appellant contends that the trial court erred by failing to instruct the jury regarding self-defense. Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Initially, we determine whether an error occurred, and then "determine whether sufficient harm resulted from the error to require reversal." *Abdnor*, 871 S.W.2d at 731-32; *Almanza*, 686 S.W.2d at 171.

8

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence . . . ." Tex. Code Crim. Proc. art. 36.14. The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208-09 (Tex. Crim. App. 2007). A trial court's decision to deny a defensive issue in a jury charge is reviewed for an abuse of discretion. *Gaspar v. State*, 327 S.W.3d 349, 355 (Tex. App.—Texarkana 2010, no pet.) (citing *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000)). When reviewing a trial court's decision to deny a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested submission. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). A defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007).

A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. Tex. Penal Code § 9.31(a). The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:

9

(1) knew or had reason to believe that the person against whom the force was used:

  (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

  (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

  (C) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.*  The use of force against another is not justified in response to verbal provocation alone.  *Id.* § 9.31(b)(1).  Nor is force justified if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter or clearly communicates his intent to do so reasonably believing he cannot safely abandon the encounter and the other continues or attempts to continue to use unlawful force against the actor.  *Id.* § 9.31(b)(4).  A person is justified in using deadly force against an other (1) if he would be justified in using force under Section 9.31; and (2) when and to the degree he reasonably believed the deadly force was immediately necessary to protect himself the other's use of unlawful deadly force.  *Id.* § 9.32(a).  A "reasonable belief" is one held by an ordinary and prudent person in the same circumstance as the actor.  *Id.* § 1.07(42).

   Review of the record in the light most favorable to appellant does not reveal any basis for appellant to reasonably believe that he needed to use any force, much less deadly force, against

Dutcher. The only evidence is that appellant initiated the encounter and was the aggressor through it. There is evidence that Dutcher yelled back at appellant and lifted his hands to protect himself. One witness testified that the two men hit and pushed a little bit. But there is no evidence of the level of force used by Dutcher that would support giving an instruction under Penal Code section 9.31(a) or 9.32. Even if there were some evidence that Dutcher responded to appellant's aggression with a level of force that merited a self-defense instruction for appellant, the undisputed evidence that appellant initiated the confrontation and the lack of any evidence that appellant attempted to abandon the encounter supports the trial court's decision not to give the instruction. *See id.* § 9.31(b)(4). The evidence presented showed that appellant initiated the confrontation and maintained his aggression despite Dutcher's unilateral attempt to retreat. On this evidence we find no error in the trial court's refusal to give the self-defense instruction.

## Conclusion

Having found no merit in appellant's issues, we affirm the judgment of conviction.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:  August 23, 2013

Do Not Publish

11